**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JAMES STIFFLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 05-1112 |
| v. | ) | |
| | ) | |
| EQUITABLE RESOURCES, INC., | ) | Judge Terrence F. McVerry |
| | ) | Magistrate Judge Lisa Pupo Lenihan |
| Defendant. | ) | Re: Doc. No. 9 |

**REPORT AND RECOMMENDATION**

I.      RECOMMENDATION

_____It is respectfully recommended that the Motion for Summary Judgment filed by

Defendant Equitable Resources, Inc. at Docket No. 9 be granted.

II.      REPORT

_____Plaintiff James Stiffler ("Plaintiff") brings this claim of age discrimination in

employment under the Age Discrimination in Employment Act ("ADEA") and the Pennsylvania

Human Relations Act ("PHRA"), 43 Pa. Stat. § 951 et seq.  Plaintiff also claims reverse race

discrimination in employment under Title VII of the Civil Rights Act of 1964, as amended, 42

U.S.C. § 2000e et seq. ("Title VII") and the PHRA.  Specifically, Plaintiff claims that Defendant

Equitable Resources, Inc. ("Defendant" or "Equitable" or "Company") terminated his

employment on the basis of his age and race in violation of the ADEA, Title VII, and the PHRA.

Plaintiff also asserts a claim for unpaid commissions under Pennsylvania's Wage Payment

Collection Law, 43 P.S. § 260.1, et seq.

_____The issue presented in Defendant's Motion for Summary Judgment is whether Plaintiff has adduced sufficient evidence to prove that Defendant's articulated reasons for terminating Plaintiff's employment are pretext for age and reverse race discrimination.  Because the Court finds that no material issues of fact exist and that Defendant is entitled to judgment as a matter of law, the Court recommends that Defendant's Motion for Summary Judgment be granted.

A.    Relevant Facts

Viewing the facts in a light most favorable to Plaintiff, the following are relevant to the pending Motion for Summary Judgment.

_____Equitable is an integrated energy company, with an emphasis on natural gas supply activities including production and gathering, and natural gas distribution and transmission.  (Doc. No. 10 at ¶ 1, Doc. No. 30 at ¶1.)[1]  Equitable offers energy products and services through two business segments: Equitable Utilities and Equitable Supply.  (Doc. No. 10 at ¶ 2, Doc. No. 30 at ¶ 2.)  Equitable Utilities, in turn consists of two components: Equitable Gas Company ("Equitable Gas") and Equitrans, L.P.  (Doc. No. 10 at ¶ 3, Doc. No. 30 at ¶ 3.)  Equitable Gas distributes natural gas to commercial and residential customers.  (Doc. No. 10 at ¶ 4, Doc. No. 30 at ¶ 4.)

In the mid to late 1990s, Equitable Gas transitioned from a non-competitive, highly regulated market in which customers had to obtain service from Equitable Gas to a

_____

[1]The facts are taken from the parties' various submissions including their respective Statements of Undisputed Material Facts and Responses thereto, and are cited by their assigned Docket Numbers as Doc. No. __ at ¶ __.

competitive, less regulated market with "unbundled services" in which customers could choose their natural gas supplier.  (Doc. No. 10 at ¶ 6, Doc. No. 30 at ¶ 6.)  In the midst of this transition, Murry Gerber ("Gerber") became Chief Executive Office of Equitable in May 1998, at the age of 45.  (Doc. No. 31 at ¶ 13, Doc. No. 44 at ¶ 13.)

Gerber testified in deposition that when he arrived, "Equitable Resources was a company . . . in very dire condition."  It had lost the confidence of its shareholders and "had fallen to the worst performance in the utility sector in America."  (Gerber Dep. at 6.)  With regard to Equitable Gas, Gerber continued as follows:

> Equitable Gas Company itself was considered one of the worst gas companies in America.  Its return was dismal.  Its customer service was dismal.  It had an extraordinarily unprepared, unanalytical work force.  It was incapable of making informed decisions based on data and economic principle.  So like Equitable Resources, it was also in dire condition.

(Gerber Dep. at 7-8; Doc. No. 31 at ¶ 28, Doc. No. 44 at ¶ 28.)  During the first three to six months of his employment he noticed three indicators of this financial condition.  (Gerber Dep. at 8.)  First, he noticed "that the company had invested in too many businesses for which it had no capability to be successful.  . . . [I]t had lost focus on a few core businesses."  (Gerber Dep. at 8; Doc. No . 31 at ¶ 8.)  Consequently, in October 1998, a restructuring plan was approved with specific action intended to improve the focus on Equitable's core businesses and reduce overall cost structure.  In 1998 and 1999, Equitable sold its natural gas midstream operations in Louisiana, Houston and Calgary; redirected offshore gas and oil exploration and production in the Gulf of Mexico; improved the efficiency of Appalachian production operations by decertifying certain pipeline facilities, exited certain noncore businesses; decentralized administrative functions, and eliminated a substantial number of positions across the company.

(Doc. No. 10 at ¶ 13, Doc. No. 30 at ¶ 13.)  By the first quarter of 1999, a total of 164 employees had left the Company.  (Doc. No. 10 at ¶ 14, Doc. No. 30 at ¶ 14.)  Second, Gerber noticed that the return on capital of the company was the worst in the industry.  (Gerber Dep. at 9.)  Finally, Gerber testified that he believed the following:

> [T]he processes and procedures by which work was done in the company were old.  They were flawed, not up to the standard of what a modern successful company's processes should be.  This includes not only the processes by which we did work, but also the processes by which we made decisions in the company.

(Gerber Dep. at 9-10; Doc. No. 31 at ¶ 29; Doc. No. 44 at ¶ 29.)  Gerber indicated that he believed that the performance of an individual in any company affects the performance of every other individual in the company.  To the extent that a substandard employee remains with the company, in Gerber's view, it causes the performance of others to deteriorate.  (Doc. No. 31 at ¶ 33, Doc. No. 44 at ¶ 33.)  In response to questioning by Plaintiff's counsel, Gerber also testified in deposition about his understanding of the words renovate and reinvent found in a slogan or tag line on the bottom of some company documents.[2]  Gerber testified as follows:

> Q.    What does renovate and reinvent – strike that.
>       Was that a slogan that you developed, renovate and reinvent, something similar to that?
> A.    It was more than a slogan.  It was part of the strategy.  But, yes, I invented that term or that phrase.
> Q.    Renovate and reinvent?
> A.    Yes.
> Q.    Could you describe what that means, please?

_____

[2]Plaintiff points to Gerber's omission of the term "re-energize" in his deposition testimony at pages 45-46 and suggests that Defendant ignores the first word of the slogan because "it could be a code word reflecting age bias."  (Doc. No. 30 at ¶ 12.)  Plaintiff overlooks the fact it was Plaintiff's counsel who omitted the first word of the slogan in his questioning to Gerber.  Gerber's discussion as to his understanding of only the words "renovate" and "reinvent," was in direct response to Plaintiff's counsel's question.  Plaintiff was not asked about his understanding of the meaning of the word "re-energize."  See Gerber Dep. at 45-46.

A.     Yes, I can.  Renovate in the context of Equitable meant very simply to take the company from its poor return on capital position and increase its profitability such that it was earning at least the cost of capital, and that was what renovate meant.

It was meant as a term to describe the early part of the process to turn Equitable around from the worst performing company in the industry, which it was, to a higher performing company in the industry, which it now is.  So that's what renovate meant.  It meant strictly speaking, improve the return on capital of the company.

Reinvent specifically referred to a more prospective phase of the company which we're currently in wherein we do things – we do things in our company better than the next company in our industry does them.  So it didn't matter whether it's a business line.  If we were in a business line that another competitor had a similar business line in, we expect it to perform better.  We expect our profit to be better.  We expect our processes to be better.  So it was a tag line for what we needed to do to be a long-term survivor in the industry, reinvent how we do what we do.

So that's how that renovate and reinvent fit together.  It wasn't a slogan.  It had specific drivers, and it does have specific drivers.

(Gerber Dep. at 45-46.)

In the fourth quarter of 1998, Equitable Gas offered a Voluntary Resignation Program.  (Doc. No. 31 at ¶ 7, Doc. No. 44 at ¶ 7.)  Gerber testified as to the rationale for this Program and why it was offered.  To this end, Gerber indicated that the Program was related to productivity.  Gerber testified that he was changing the company strategy and there were a number of people who were working in the company that for various reasons were being employed in business lines and functions that were being de-emphasized in his new strategy. Consequently, Gerber and management believed that it was a good idea to offer a program where employees, who believed their jobs might be eliminated, or thought that their jobs or their unit's businesses  would be de-emphasized, could utilize this Program to voluntarily change jobs or make a change in career or life at this point in time.  (Doc. No. 31 at ¶ 8, Doc. No. 44 at ¶ 8.)

Gerber also introduced the concept of "value drivers" - the "actions that people or

groups of people in organizations can take to improve the value of the company." (Doc. No. 10 at ¶ 15, Doc. No. 30 at ¶ 15.) Gerber and senior management agreed upon company-level value drivers that, in turn, prompted "individual more specific goals through the organization." (Doc. No. 10 at ¶ 16, Doc No. 30 at ¶ 16.) Gerber believed that there had been problems with the old performance evaluation plan. (Gerber Dep. at 28.) It did not include specifics with regard to individual performance. (Gerber Dep. at 28.) Charlene Petrelli, Corporate Vice President of Human Resources who started working at Equitable in October, 2000, testified that Gerber "was trying to take an organization from an employee cultural perspective [that] had an entitlement mentality and move it towards a high performing organization where performance was differentiated and rewarded." (Petrelli Dep. at 65.) Petrelli explained what she understood to be Gerber's use of the phrase "entitlement mentality" as follows:

> We had a number of employees who believed or perceived that when they came to work for Equitable Resources, their obligation to the company was to show up for work most of the time and that they were then guaranteed a job for life until they decided to leave the organization.

(Petrelli Dep. at 65.) Petrelli testified that Gerber used the phrase "entitlement mentality" and that "[h]e didn't have to explain much" as to how he came to this conclusion as she "had seen that behavior in other organizations as well." (Petrelli Dep. at 65.)[3]

Petrelli, a relatively new employee, also testified that she had learned from others the history of the performance evaluation system at Equitable. She learned from David Smith,

_____

[3]Plaintiff directs this Court to Gerber's deposition wherein he testified that he did not remember using the phrase "entitlement mentality." (Doc. No. 31 at ¶ 27.) Gerber testified that "[t]here may be many ways to describe what the culture was. Perhaps that's her way of consolidating my opinions into one word." (Gerber Dep. at 12.)

Equitable's Director of Compensation and Benefits, that at times "employees didn't receive a performance review at all, and when they did receive one, no manager wanted to deliver bad news.  So everyone was told they were doing great."  (Petrelli Dep. at 82; Doc. No. 31 at ¶ 14.) As to the old evaluation system, Smith testified that he did not produce reports or analysis concerning the old system but indicated that the system could have been better.  (D. Smith Dep. at 34-35; Doc. No. 31 at ¶¶ 16 & 17.)  When asked whether there were consequences associated with a poor performance under the old evaluation system, Smith testified as follows:

> The program lacked discipline.  The rating system, everyone–everyone is too general.  Almost everyone fell into the middle.  We weren't distinguishing between exceptional performers and we weren't identifying poor performers.  We were giving almost everybody a middle rating and not using the performance management system in a way that I feel is most constructive for the company.

(D. Smith Dep. at 36.)  Thereafter, Smith and Petrelli were charged with designing a new performance management system.  (Doc. No. 10 at ¶ 25, Doc. No. 30 at ¶ 25; D. Smith Dep. at 36.)  Smith testified regarding a meeting with Gerber, Spencer (former Corporate Vice President of Human Resources), and Dave Porges in the second quarter of 2000 where a new performance evaluation system was discussed.  The discussions concerned the ratings of "exceptional," "successful," and "unsatisfactory."  Smith indicated that the members of the meeting could not answer the question as to whether anyone would ever rate someone as unsatisfactory.  (D. Smith Dep. at 54.)  Consequently, the following discussion ensued:

> So the discussion went why don't we put some percentage down there of expectation, and then if a particular business unit can't meet that expectation, down the road they can certainly argue the case that someone shouldn't be an L performer, but at least give them some expectation to look at, a guideline.
> Q.   So, in other words, if a business unit didn't meet its expectation, you would expect the performance evaluation systems of that business unit to reflect there

were some poor performers?
A.    Correct.

(D. Smith Dep. at 54; Doc. No. 31 at ¶ 24.)

Hence, Equitable adopted a performance evaluation system requiring that a minimum 10% of employees in any given year be given an "L-Lower 10%" performance rating. (Doc. No. 31 at ¶ 34, Doc. No. 44 at ¶ 34.)  The other performance ratings included in the new performance evaluation system included "Exceptional" with a proposed distribution of 0 to 20% and "Successful" with a proposed distribution target of 70%.  The definitions for the various ratings were as follows:

Exceptional-Makes significant contribution to department, Business Unit and/or Company value Drivers.  Overall performance far exceeds all requirements necessary to fulfill the principal duties, responsibilities, and expectations of position.

Successful-Overall performance meets all requirements necessary to fulfill the principal duties, responsibilities, and expectations of the position.

Lower 10%-On a relative basis, overall performance is in the lower 10% of the group for the applicable business unit.

(Appendix to Plaintiff's Brief in Opposition to Motion for Summary Judgment at Doc. No. 35 at p. 6.)  Equitable Vice President Art Cantrell testified that the "policy was that we were attempting to adhere to the recommended distribution . . . of approximately 20 percent E's, 70 percent S's and 10 percent the L."  (Cantrell Dep. at 149.)  If the performance distribution as reflected on the spreadsheet was less than 10%, Davis, Vice President of Human Resources, would then meet with the functional heads of various departments and talk again about the distribution and make sure that everyone was evaluated properly.  Vice Presidents Cantrell and

Crawford may raise questions if a distribution was below 10%.  If so, and after Davis spoke to supervisors, there would be another round of meetings with Crawford, Cantrell, and Davis regarding the performance distributions.  (Doc. No. 31 at ¶ 38; Doc. No. 44 at ¶ 38.)  Davis indicated that his role as an HR person in terms of talking with supervisors about whether their ratings were inflated was that of facilitator; he never forced supervisors to change their ratings but had "conversations with department heads challenging whether the goals that they set were . . . going to get the department where it needed to be[.]"  (Davis Dep. at 338.)  Davis also testified that an employee could meet all her value drivers or performance objectives, but yet receive an overall evaluation of "L" lower 10%.  (Doc. No. 31 at ¶ 20, Doc. No. 44 at ¶ 20.)

   Prior to his transfer to Energy Technology Coordinator in August 2000, Plaintiff was a Key Accounts Manager.  (Doc. No. 10 at ¶ 63, Doc. No. 30 at ¶ 63.)  As Key Accounts Manager, Plaintiff had had responsibility for managing a commercial and industrial account base of roughly 100 customers, providing "total customer service, metering, negotiating contracts, selling commodity gas, prospecting for incremental load, looking for conversion opportunities."  (Doc. No. 10 at ¶ 65, Doc. No. 30 at ¶ 65 (quoting Stiffler Dep. at 29-30).)  Plaintiff was to maintain the commercial and industrial accounts he was assigned and to increase margin at each of those accounts.  (Doc. No. 10 at ¶ 66, Doc. No. 30 at ¶ 66.)

   As Energy Technology Coordinator, Plaintiff was to assist the other representatives in new project development, looking for incremental opportunities for gas sales, to implement projects that would add equipment or load to the Equitable system.  (Doc. No. 10 at ¶ 67, Doc. No. 30 at ¶ 67.)  A key focus of Plaintiff's new position was to identify and propose to existing or potential customers ways in which technology could make it worth their while to

convert to, or increase their use of, natural gas.  (Doc. No. 10 at ¶ 68, Doc. No. 30 at ¶ 68.)

Stephen Graham was Plaintiff's immediate supervisor in his new position.  (Doc. No. 10 at ¶ 64,

Doc. No. 30 at ¶ 64.)  Graham had done energy technology work for approximately five years in

a prior position at People's Gas and considered it important to identify conversion opportunities

and increase revenues.  (Doc. No. 10 at ¶¶ 69-70, Doc. No. 30 at ¶¶ 69-70.)  Plaintiff identified

the detailed duties of the Energy Technology Coordinator position and wrote up the position

description.  (Doc. No. 10 at ¶ 72, Doc. No. 30 at ¶ 72.)

      Plaintiff's reassignment from the Key Accounts Manager position to the Energy

Technology Coordinator position was implemented gradually.  The year 2001 was to be a

transitional one in which Plaintiff performed the responsibilities of both positions.  (Doc. No. 10

at ¶ 73, Doc. No. 30 at ¶ 73.)  His account responsibilities decreased as his accounts were

gradually transitioned to other representatives and he assumed energy technology responsibilities.

(Doc. No. 10 at ¶ 74, Doc. No. 30 at ¶ 74.)  Graham considered Plaintiff's account

responsibilities and energy technology responsibilities in 2001 to be a 50/50 split.  (Doc. No. 10

at ¶ 77, Doc. No. 30 at ¶ 77.)

      On February 15, 2002, Plaintiff was given an "L" performance rating for the year

2001 and was placed on a PIP by his supervisor, Graham, and received his PIP document from

Graham and Davis.  (Doc. No. 10 at ¶¶ 54, 95, Doc. No. 30 at ¶ 54, 95.)  At this time, Equitable

Gas was part of the Equitable Utilities business unit and was run by two Executive Vice

Presidents, Art Cantrell and Randy Crawford, who divided responsibilities between themselves.

(Doc. No. 10 at ¶ 56, Doc. No. 30 at ¶ 56.)  Graham reported directly to Crawford who was

responsible for commercial and industrial sales and marketing, rather than to Cantrell.  (Doc. No.

10 at ¶ 57, Doc. No. 30 at ¶ 57.)  Crawford reviewed Plaintiff's evaluation but provided no specific comments.  (Doc. No. 10 at ¶ 59, Doc. No. 30 at ¶ 59.)  Plaintiff received satisfactory ratings for his account-related duties, but received "L"s in areas related to his responsibilities as Energy Technology Coordinator.  (Doc. No. 10 at ¶¶ 79-80, Doc. No. 30 at ¶¶ 79-80.)  One area in which Plaintiff received an "L" rating involved an Energy Technology Seminar to be managed and run by Plaintiff.  (Doc. No. 40 at p. 9.)

Plaintiff appealed his "L" rating to Equitable's Compensation Review Committee, chaired by David Smith, which met on February 26, 2002.  (Doc. No. 10 at ¶¶ 84-85, Doc. No. 30 at ¶¶ 84-85.)  During the appeal, Stiffler did not argue that the three value drivers for which he received "L"s had been met.  Instead, he argued that he had received more "E" and "S" ratings than "L" ratings on value drivers.  (Doc. No. 10 at ¶ 90, Doc. No. 30 at ¶ 90.)  Smith explained to Plaintiff that the overall rating was a relative rating and that averaging the individual ratings was not appropriate.  (Doc. No. 10 at ¶ 91, Doc. No. 30 at ¶ 91.)  Plaintiff also argued that the goals were a stretch and some of them were unreasonable and that the seminar had not been conducted because too few vendors were willing to attend.  (Doc, No. 10 at ¶ 92, Doc. No. 30 at ¶ 92.)  In recommending that the ratings not be changed because (in its view) the three value drivers had not been met, the Committee specifically found that management had expected the energy seminar to generate significant opportunities for new business and that Plaintiff should have asked for clear direction from management before making the decision to cancel the meeting for expense reasons.  (Declaration of D. Smith, Doc. No. 20 at p. 9.)  Plaintiff's appeal was denied by Gregory Spencer, Senior Vice President and Chief Administrative Officer of Equitable Resources at that time.  (Doc. No. 10 at ¶ 94, Doc. No. 30 at ¶ 94.)

Plaintiff objected to some of the goals and deadlines in the PIP, and modifications were made to address all of those objections.  Plaintiff was given a revised PIP on February 27, 2002.  (Doc. No. 10 at ¶ 96, Doc. No. 30 at ¶ 96.)  The PIP began on March 1, 2002 after which Plaintiff prepared project proposals and wrote weekly PIP reports.  (Doc. No. 10 at ¶¶ 97, 102, Doc. No. 30 at ¶¶ 97, 102.)  On April 22, 2002, Plaintiff met with Davis and Graham for a 30-day PIP review and was told that his proposals should be more specific so that customers would have more information with which to make decisions.  (Doc. No. 10 at ¶¶ 107-08, Doc. No. 30 at ¶¶ 107-08.)  Plaintiff also received a memorandum from Graham dated April 22, 2002, noting various deficiencies in Plaintiff's performance to date, including his inability to close technical projects, the lack of thoroughness on technical proposals, and insufficient detail and analysis regarding the natural gas vehicle exit strategy.  (Stiffler Dep. Ex. 6, Doc. No. 14 at p. 19.)

The working relationship between Plaintiff and his supervisor Graham was poor.  Plaintiff considered Graham a bad manager.  (Doc. No. 10 at ¶ 160, Doc. No. 30 at ¶ 160.)  In Plaintiff's opinion, Graham "had no prior supervisory skills, and that was evident as the department deteriorated under his supervision in respect to reaching goals, and he failed to communicate one on one and also in meetings with the whole department.  He was very vague or aloof.  And it's just that we didn't see eye to eye on some things."  (Doc. No 10 at ¶ 161, Doc. No. 30 at ¶ 161 (quoting Stiffler Dep. at 213).)  Plaintiff felt that Graham's management deficiencies and his failure to communicate impacted not just him but the entire department.  (Doc. No. 10 at ¶ 162, Doc. No. 30 at ¶ 162.)  According to Plaintiff, he and Graham had a mutual dislike for one another and Plaintiff believes that Graham personally disliked him because Plaintiff was more intelligent than Graham and because Plaintiff stood up to him on behalf of the

whole department.  (Doc. No. 10 at ¶¶ 163-64, Doc. No. 30 at ¶¶ 163-64.)

In May 2002, William Lucas replaced Graham as Director of Sales, became Plaintiff's immediate supervisor, and then participated with Davis in administering Plaintiff's PIP.  (Doc. No. 10 at ¶ 61, Doc. No. 30 at ¶ 61.)  On May 20, 2002, Plaintiff met with Lucas on Lucas's first day as Director of Sales and told Lucas that his PIP was unreasonable, that he did not want to be at Equitable under those circumstances, that at one point he had enjoyed working at Equitable but he no longer did, his opinion of the company had changed significantly, and that he was dissatisfied with the company and the way it was being run.  (Doc. No. 10 at ¶ 113, Doc. No. 30 at ¶ 113.)  Lucas spoke with Davis to understand how the goals and objectives of Plaintiff's PIP had been developed; he also was given the weekly reports that Plaintiff had been providing to that point in the PIP; and going forward, he received weekly reports and discussed with Davis what Plaintiff was doing.  (Doc. No. 10 at ¶ 118, Doc. No. 30 at ¶ 118.)  Lucas's goals for his department included ensuring customer retention, proactively pursuing conversion and bypass opportunities, and ensuring that commercial and industrial customers were signed to contracts to try to stop the migration of accounts to Equitable's competition.  (Doc. No. 10 at ¶ 121, Doc. No. 30 at ¶ 121.)  Davis was responsible for administering the PIP, but as Plaintiff's immediate supervisor, Lucas participated with Davis in PIP-related meetings with Plaintiff, assessed Plaintiff's performance on departmental goals, and participated in the discharge decision.  (Doc. No. 10 at ¶ 119, Doc. No. 30 at ¶ 119.)

Davis drafted a letter to Plaintiff dated June 13, 2002 outlining Plaintiff's performance to date, and again informing him that it still was not acceptable.  (Stiffler Dep. Ex. 26, Doc. No. 14 at pp. 20-22.)  Davis reviewed the letter with Lucas before it was given to

Plaintiff.  (Doc. No. 10 at ¶ 124, Doc. No. 30 at ¶ 124.)  Davis testified that the 90-day PIP

period was extended to give the Plaintiff the opportunity to perform satisfactorily.  (Davis Dep. at

305.)  Davis explained as follows:

> The concern from the company's point of view was his relationships and
> knowledge of our customers and the territory, and frankly the company wasn't
> anxious to not have him continue.  So we were giving every opportunity for him
> to get to an acceptable level.

(Davis Dep. at 305.)  On July 12, Plaintiff submitted a report outlining his efforts to meet the

various PIP objectives.  (Doc. No. 10 at ¶ 134, Doc. No. 30 at ¶ 134.)  Based on Plaintiff's daily

performance, Lucas concluded that he was failing to meet the departmental objectives.  (Doc. No.

30 at ¶ 143, Doc. No. 30 at ¶ 143.)  Plaintiff was discharged on July 12, 2002 at a meeting with

Davis and Lucas.  (Doc. No. 10 at ¶ 145, Doc. No. 30 at ¶ 145.)


B.    Legal Standard

Summary judgment is appropriate if, drawing all inferences in favor of the

nonmoving party, "the pleadings, depositions, answers to interrogatories and admissions on file,

together with the affidavits, if any, show that there is no genuine issue of material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56 (c).  Summary judgment

may be granted against a party who fails to adduce facts sufficient to establish the existence of

any element essential to that party's case, and for which that party will bear the burden of proof

at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party bears the initial

burden of identifying evidence which demonstrates the absence of a genuine issue of material

fact.  Once that burden has been met, the nonmoving party must set forth "specific facts showing

that there is a <u>genuine issue for trial</u>" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  <u>Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e) (emphasis added by <u>Matsushita</u> Court).  An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  <u>Anderson v. Liberty-Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

Defendant argues that summary judgment should be granted in its favor on the following grounds: 1) Plaintiff has failed to make out the fourth element of his <u>prima facie</u> case with regard to both age and reverse race discrimination because no one was hired to replace him; 2) Defendant has articulated a legitimate, non-discriminatory business reasons for Plaintiff's discharge; 3) Plaintiff cannot create a triable issue with regard to pretext; and 4) there was no commission plan in effect at the time for which Plaintiff is claiming unpaid commissions.

In opposition to Defendant's Motion for Summary Judgment, Plaintiff argues the following: 1) Plaintiff has made out his <u>prima facie</u> case; 2) Plaintiff can show pretext by demonstrating inconsistencies and implausibilities concerning Defendant's articulated business reasons for discharge as follows: a) the most emphasized goal of Plaintiff's PIP was never completed and no one was ever hired to replace Plaintiff; b) Defendant's creation of Plaintiff's position of Energy Technology Coordinator was done under suspicious circumstances; c) corporate culture is evidence of discriminatory animus; d) Plaintiff was "on the list" to be fired and placed on "watch" by Cantrell; d) Graham wrote "separate and backfill" next to Plaintiff's name prior to PIP plan and therefore Defendant's articulated business reason for discharge is false; e) Plaintiff's PIP goals were unrealistic and therefore a set up for Plaintiff to fail; f) Lucas's

testimony is inconsistent with Defendant's reasons for discharge; g) Defendant's evolving and changing reasons for Plaintiff's discharge are also evidence of pretext; h) new hires start 10 days after Plaintiff's discharge; i) Plaintiff was never disciplined or warned about poor performance in 20 years with the company; j) statistics support an inference of discrimination; and 3) Plaintiff is owed $40,000 in commissions.

      C.      Analysis

      1.      ADEA, Title VII, and PHRA claims

      Plaintiff avers that Defendant terminated his employment on the basis of his age and race in violation of the ADEA, Title VII, and the PHRA.  See Amended Complaint at Doc. No. 4.  When there is no direct evidence of discrimination, a plaintiff may use circumstantial evidence to establish discrimination using the three-prong burden shifting analysis originally set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).[4]  The parties agree that the claims presently before this Court are governed by the burden shifting analysis of McDonnell Douglas.[5]  See also Fasold v. Justice, 409 F.3d 178, 183-84 (3d Cir. 2005).

_____

[4]Plaintiff's Title VII and ADEA claims are governed by the same burden shifting analysis.  See McKenna v. Pacific Rail Service, Inc., 32 F.3d 820, 825-26 & n. 3 (3d Cir. 1994).

[5]The United States Court of Appeals for the Third Circuit has stated "that the PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently."  Fasold, 409 F.3d at 184 n. 8 (quoting Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567 (3d Cir. 2002)).  Finding no such distinguishing language, the Third Circuit has interpreted the relevant provisions of the ADEA and the PHRA "as applying identically . . . and as being governed by the same set of decisional law."  Id. (citing Fogleman, 283 F.3d at 567).  See also Gomez v. Allegheny Health Servs., Inc., 71 F.3d 1079, 1083-84 (3d Cir. 1995) (PHRA and Title VII are interpreted similarly).

Pursuant to the <u>McDonnell Douglas</u> burden shifting analysis, a plaintiff employee must first establish a <u>prima</u> <u>facie</u> case of discrimination.  <u>Fasold</u>, 409 F.3d at 184.  In order to make out a <u>prima</u> <u>facie</u> case in an ADEA action, a plaintiff must establish the following: 1) that he is older than 40; 2) that he was qualified for the job from which he was discharged; 3) that he was discharged; and 4) was replaced by someone sufficiently younger to give rise to an inference of discrimination.  <u>Id</u>. (citing <u>Potence v. Hazelton Area Sch. Dist.</u>, 357 F.3d 366, 370 (3d Cir. 2004); <u>Anderson v. Consol. Rail Corp.</u>, 297 F.3d 242, 249 (3d Cir. 2002)).  The <u>Fasold</u> Court emphasized that there is no "hard and fast rule covering what a plaintiff must show" in establishing a <u>prima</u> <u>facie</u> case, but that the precise elements may vary with the circumstances. <u>Fasold</u>, 409 F.3d at 185 n. 10.  Consequently, where a plaintiff's job is eliminated and his position consolidated with that of another employee, a plaintiff may still make out a <u>prima</u> <u>facie</u> case by showing the following: "1) he belongs to the protected class; 2) he was qualified for the consolidated position; 3) he was terminated despite being qualified; and 4) the person who obtained the consolidated position is sufficiently younger to permit an inference of age discrimination." <u>Gelover v. Lockheed Martin</u>, 971 F. Supp. 180, 183 (E.D. Pa. 1997) (applying <u>O'Connor v. Consolidated Coin Caterers Corp.</u>, 517 U.S. 308 (1996)).[6]

After Plaintiff has established his <u>prima</u> <u>facie</u> case, the burden of production (but not the burden of persuasion) shifts to Defendant employer to articulate some legitimate, nondiscriminatory reason for Plaintiff's termination.  <u>See</u> <u>Fasold</u>, 409 F.3d at 184 (citing <u>Storey v. Burns Int'l Sec. Servs.</u>, 390 F.3d 760, 764 n. 11 (3d Cir. 2004); <u>Shellenberger v. Summit</u>

---

[6]Likewise, in order to establish a <u>prima</u> <u>facie</u> case of reverse race discrimination under Title VII, the Plaintiff must establish that Defendant is treating him less favorably than others because he is white.  <u>See</u> <u>Iadimarco v. Runyon</u>, 190 F.3d 151, 163 (3d Cir. 1999).

Bancorp. Inc., 318 F.3d 183, 187 (3d Cir. 2003)).  The employer need not prove, however, that

the proffered nondiscriminatory reasons actually motivated the decision to terminate.  See Kautz

v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005) (discussing Stanziale v. Jargowsky, 200 F.3d

101, 105 (3d Cir. 2000)).  If the Defendant employer is able to articulate one or more such

reasons, the Plaintiff "employee must then proffer evidence that is sufficient to allow a

reasonable finder of fact to find by preponderance of the evidence that the employer's proffered

reasons are false or pretextual."  Id. (citing Sarullo v. United States Postal Serv., 352 F.3d 789,

797 (3d Cir. 2003)).

   To survive a motion for summary judgment at step three of the burden shifting

analysis, Plaintiff must present some evidence from which a reasonable jury could either: "(1)

disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious

discriminatory reason was more likely than not a motivating or determinative cause of the

employer's action."  Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) (citing St. Mary's Honor

Ctr. v. Hicks, 509 U.S. 502 (1993); Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509,

523 (3d Cir. 1992)).  In Fuentes, the United States Court of Appeals for the Third Circuit further

explained the quantum of proof required at step three as follows:

>   To discredit the employer's proffered reason, however, the plaintiff cannot
> simply show that the employer's decision was wrong or mistaken, since the
> factual dispute at issue is whether discriminatory animus motivated the employer,
> not whether the employer is wise, shrewd, prudent, or competent.  Rather, the
> non-moving plaintiff must demonstrate such weaknesses, implausibilities,
> inconsistencies, incoherencies, or contradictions in the employer's proffered
> legitimate reasons for its action that a reasonable factfinder could rationally find
> them "unworthy of credence," and hence infer "that the employer did not act for
> [the asserted] non-discriminatory reasons."

Fuentes, 32 F.3d at 765 (emphasis in original) (quoting Ezold, 983 F.2d at 531) (other internal

18

quotations omitted).  That is, the plaintiff must show, not simply that the defendant's articulated

business reason was wrong, "but that it was so plainly wrong that it cannot have been the

employer's real reason."  Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir.

1997).  The plaintiff must "present evidence contradicting the core facts put forward by the

employer as the legitimate business reason for its decision."  Kautz, 412 F.3d at 467 (emphasis

added).  Evidence contradicting these core facts must be directed at the decision-maker's belief;

plaintiff's own beliefs and personal judgments, without more, will not raise a genuine issue of

material fact.  Simpson v. Kay Jewelers, Inc., 142 F.3d 639, 647 (3d Cir. 1998) ("Simpson's

view of her performance . . . is not relevant.").  It is important to note that in light of this standard

for proving pretext at step three of the McDonnel Douglas paradigm, the United States Supreme

Court has made clear that a plaintiff is not required to present affirmative evidence of

discrimination in addition to proof of pretext.  See Reeves v. Sanderson Plumbing Products, Inc.,

530 U.S. 133, 147 (2000).  Instead, "[i]n appropriate circumstances, the trier of fact can

reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a

discriminatory purpose."  Id.  (emphasis added).[7]  The United States Court of Appeals for the

Third Circuit recently discussed the impact of Reeves on the Fuentes standard for proving pretext

as follows:

> Although Reeves makes clear that we may not require affirmative evidence of
> discrimination in addition to proof of pretext, it does not change our standard for
> proving pretext which "places a difficult burden on the plaintiff."

Kautz, 412 F.3d at 467 (quoting Fuentes, 32 F.3d at 765).

_____

[7]In Reeves the United States Supreme Court granted certiorari to resolve a split in the
circuits as to whether a plaintiff is required to produce affirmative evidence of discrimination in
addition to proof of pretext.  530 U.S. at 140.

In light of the Third Circuit's directive against the application of a rigid test for establishing a prima facie case, this Court must be guided by the facts and circumstances at bar. The facts here indicate that subsequent to his termination, Plaintiff's general responsibilities including the pursuit of conversion opportunities, were performed by Lucas and other sales representatives.  (Lucas Dep. at 118-19.)  Plaintiff contends that subsequent to his departure, "Defendant began hiring new younger employees into the Marketing and Sales Department." (Doc. No. 29 at pp. 20-21.)  Consequently, applying the fluid standard articulated by this Circuit, this Court finds that Plaintiff has established a prima facie case under the ADEA.

Moving to the second step of the McDonnel Douglas paradigm, Defendant has met its burden of production by articulating legitimate business reasons for Plaintiff's termination.  According to Defendant, Plaintiff was discharged because he did not meet his PIP objectives; his performance had been marginal: he was distracted from the departmental goals and objectives; he was inefficient, he lacked computer acumen; he lacked the desire to do the job; he was bitter toward the Company; he had a personality conflict with Graham; and he was not efficiently using his time.

Plaintiff claims that there are many examples of inconsistencies and implausibilities in Defendant's proffered reasons, and other facts, that demonstrate such reasons are unworthy of belief.  A careful analysis of Plaintiff's following arguments, however, reveals that they are not directed at disputing the core facts proffered by Defendant as its nondiscriminatory reasons for its discharge decision.  Instead, Plaintiff directs this Court to a multitude of other facts that have nothing to do with Defendant's proffered reasons for discharge.

First, Plaintiff argues that the most compelling inconsistencies were the

Defendant's decision not to fill the position of Energy Coordinator after Plaintiff's discharge, and the decision not to assign individuals to complete the 27 equipment conversion opportunities identified as the most important goals on Plaintiff's PIP. That is, Plaintiff contends that the creation of the position and the duties associated with it were a sham to terminate his employment with Defendant. Clearly, this argument has nothing to do with reasons articulated by Defendant for Plaintiff's discharge. The record is clear, however, that the Energy Technology Department had been experiencing difficulties with personnel for some time. Art Cantrell testified that from August 1999 to February 2000 the number of employees in Energy Technology decreased from four to one. One employee of this Department voluntarily left the company during this time, while two others were transferred to the operations group although some of their duties remained the same. One individual remained, James Pekor, who was responsible for technology initiatives and new technologies. The record reflects that Mr. Pekor was experiencing difficulties in this position. (Cantrell Dep. at 51-59.) Hired in November of 1999, Graham considered it important to identify conversion opportunities and increase revenue. (Doc. No. 10 at ¶ 70, Doc. No. 30 at ¶ 70). Graham became Plaintiff's immediate supervisor in August 2000 when Plaintiff was transferred from the position of Key Accounts Manager to Energy Technology Coordinator. (Doc. No. 10 at ¶¶ 63-64, Doc. No. 30 at ¶¶ 63-64.) Graham testified that he selected Plaintiff for this position because of Plaintiff's engineering background and his extensive knowledge of Defendant's customer base and because Graham believed that Plaintiff had previously worked in energy technology. (Graham Dep. At 124-27, 131.) It was Plaintiff himself who identified the detailed duties of the Energy Technology Coordinator position and wrote up the position description. (Doc. No. 10 at ¶ 72, Doc. No. 30 at 72.) More

21

importantly, Plaintiff's friend and colleague, Dennis Bearer (Stiffler Dep. at 195), testified that

the position of Energy Technology coordinator was created because the company "really didn't

have the expertise at that time for energy technology." (Bearer Dep. at 21.) When asked whether

he played a role in the creation of the position, Bearer testified that he attended a meeting with

Cantrell and Graham where he was asked his opinion of the job responsibilities as they were

initially set up. Bearer testified that he "thought they were well done." (Bearer Dep. at 22.) At

the conclusion of the meeting it was communicated that Plaintiff would be given the position.

(Bearer Dep. at 22.) Bearer also indicated that he believed Plaintiff was selected for the position

because "they [the Company] had a problem with his performance in his current position, and

they wanted to create something for him." Bearer testified that Cantrell told him that they

thought Plaintiff "was a good fit because of his background, and they thought it was a chance to

put him in a position where he possibly could excel." (Bearer Dep. a t 29.) Bearer stated that

Plaintiff "had a reputation at one time of being kind of a go to guy. If you needed technical

information, Jim pretty much had a good handle on things. He was cooperative, seemed to be a

good performer." (Bearer Dep. at 25.) Bearer testified that things changed approximately two

years before his discharge, and that at this time, Bearer indicated that Plaintiff felt persecuted and

that people were against him which caused Plaintiff to be depressed. (Bearer Dep. at 24.) Bearer

felt that the Energy Technology Coordinator position was a good opportunity for Plaintiff and

"based on his performance in the previous job, he should take this pretty seriously." (Bearer

Dep. at 29-30.) Finally, Plaintiff's new supervisor, Bill Lucas, testified that he made the decision

not to fill the Energy Technology Coordinator position after Plaintiff's termination because,

based on his previous work experience, he could fill the technical gap himself. Further, he

indicated that although the 27 equipment opportunities listed in Plaintiff's PIP were never completed after Plaintiff's departure, other conversion opportunities were cultivated by other sales representatives and assisted by Lucas towards completion.  (Lucas Dep. at 118-19.) Clearly, evidence of record supports the legitimacy of the position of Energy Technology Coordinator and the opportunity it presented to Plaintiff for a second chance to improve his performance in the Company.  Plaintiff directs this Court's attention to the fact that the 27 conversion opportunities were not pursued after Plaintiff's termination.  Therefore, argues Plaintiff, the failure to complete these conversions could not have been important enough to justify Plaintiff's discharge.  Plaintiff concludes that the Company's subsequent failure to pursue these conversions is evidence of pretext.  Plaintiff ignores the undisputed evidence of record that Plaintiff's performance had been deficient for several years and that Defendant has articulated numerous reasons for Plaintiff's discharge, not simply the fact that he failed to complete the 27 conversions.

Likewise, Plaintiff's next argument does not attempt to dispute the core facts surrounding Defendant's articulated reasons for discharge.  Instead, Plaintiff presents this Court with statistics in support of his theory that Defendant employed a company-wide policy of discriminating against its older employees under the guise of its PIP program.  Plaintiff concedes that "statistics alone are not sufficient in themselves to prove an individual disparate treatment case, nor is the Plaintiff offering the evidence for that purpose."  (Plaintiff's Memorandum Opposing Defendant's Motion for Summary Judgement, Doc. No. 29 at p. 10) (hereinafter "Doc. No. 29 at p. __").  Rather, Plaintiff states that he presents these statistics as background evidence of what was occurring at the Company at the time these termination decisions were being made.

Further, Plaintiff directs this Court to certain remarks by employees as evidence of an alleged corporate culture indicative of age discrimination in the workplace. Yet, Plaintiff has presented this Court with no evidence sufficient to allow a reasonable fact finder to conclude that Defendant's dissatisfaction with Plaintiff's performance was so clearly unwarranted that such dissatisfaction was, in fact, a pretext for a discriminatory animus. Consequently, this statistical and background evidence of corporate culture is of little assistance. Moreover, Plaintiff's statistical evidence does not detail under what circumstances these various individuals left the company during the period from 1998 to 2003. Again, without these details, such numbers are of little assistance. Moreover, a decrease in the average age of employees from 44 to 41, as advanced by Plaintiff, is not suggestive of an ageist animus where the parties agree that the workforce was primarily an older one.

Again, Plaintiff's next argument does not attempt to dispute the core facts proffered by Defendant in support of its reasons for discharge, that is, that Plaintiff did perform well where Defendant contends he did not. Instead, Plaintiff again focuses on a variety of isolated statements made by various individuals in an attempt to establish evidence of a corporate culture with an age-based animus. One statement involves a comment by Vice President Art Cantrell that the company was "too fat." Other statements highlighted by Plaintiff are that of a former Vice President, Bill Barry, that "Art [Cantrell] was bringing in his own people," and another statement allegedly made by Barry to former employee Bob Null, suggesting that Null get out of the Energy Technology position, implying that it was not in the company's future. Plaintiff also raises Gerber's slogan to re-energize, renovate, and reinvent, and the phrase "entitlement mentality." Plaintiff also points to statements made by Vice President Fred Darlena

24

about the need for "new blood, new ideas and new thinking."  In the context of these comments,

Plaintiff notes that if the company was "too fat," then why did it terminate 120 employees and

rehire 90.  Plaintiff contends that the company was not "too fat," but viewed as too old by

management.  (Doc. No. 29 at 10-11, 12-13.)  Plaintiff also mentions a comment by Davis

concerning the company's image given that so many older workers had been terminated from the

company.  When viewing the record in its entirety, all of these comments relate to Gerber's goals

of revitalizing an ailing company, and the measures put in place to achieve this end.  These

measures, as detailed above, included the newly formulated evaluation standards, or performance

improvement plan, and the voluntary resignation program as applied to the indisputably older

workforce.

    Plaintiff also directs this Court to other statements directly pertaining to age made

by managers remote in time and place to Plaintiff's discharge as evidence of a corporate culture

biased against older workers.  Again, Plaintiff has presented this Court with no evidence

sufficient to allow a reasonable fact finder to conclude by preponderance of the evidence that

Defendant's dissatisfaction with Plaintiff's performance was so clearly unwarranted that it was in

fact a pretext for age-based animus.  Consequently, this evidence of an alleged discriminatory

corporate culture is of little assistance to this Court.

    Plaintiff reiterates his first argument with the subsequent assertion that the Energy

Technology Coordinator position was created under suspicious circumstances.  (See Doc. No. 29

at p. 11.)  Specifically, Plaintiff directs this Court to the absence of Graham's signature on the

Employment Requisition form at Cantrell Deposition Exhibit No.2 (Doc. No. 38 at p. 2) and that

in light of his input with regard to energy technology, the absence of his signature is somehow

25

indicative of a hidden discriminatory animus.  Again, Plaintiff does not attempt to dispute the

core facts offered by Defendant in support of its decision to terminate him.  As discussed above,

many discussions were had with regard to the importance and lack of capabilities in the company

with regard to energy technology.  Moreover, documentary evidence reflects the existence of an

Energy Technology Department lead by a Manager or Director since at least 1998 .  (See Cantrel

Dep. Exhibit 4, Doc. No. 38 at pp. 3-7.)  Simply because a company is wrong or mistaken in its

business judgments will not raise an issue of material fact as to whether Defendant acted with a

discriminatory animus.  See Fuentes, 32 F.3d at 765.

Plaintiff's next argument appears to go to his attempt to establish a prima facie

case by arguing that Graham was actually a replacement for Plaintiff, thereby satisfying the

fourth element of a prima facie case.  As discussed above, this Court finds that in applying the

case law of this Circuit, Plaintiff has most likely established a prima facie case, and

consequently, analysis of this argument is unnecessary.

Next, Plaintiff contends that certain notations made on documents by various

individuals are evidence of pretext, including comments that Plaintiff was "on the list" to be

removed from the company, that he was on "watch" even before he was placed on his PIP.

These comments, however, simply confirm the record evidence that Plaintiff's performance had

been deficient for years, and in light of Gerber's goals for the company and his subsequent

implementation of the new performance improvement evaluation system, Plaintiff was one of the

individuals about whom management was concerned.  They are not sufficient to create a genuine

issue of fact as to Defendant's reasons for Plaintiff's discharge.

Similarly, Plaintiff argues that a document generated sometime before Plaintiff's

26

PIP which indicates "separate and backfill" (meaning terminate and refill the position) demonstrates that Defendant had made the decision to discharge Plaintiff long before he had been placed on his PIP.  Plaintiff concedes that at the time this document was generated, Plaintiff was the Energy Technology Coordinator.  (See Doc. No. 29 at p. 15.)  Based upon the employment history of Joseph Becker, Plaintiff concludes that these comments were generated no later than October 2, 2001.  By this date, Plaintiff had been in the Energy Technology position for approximately 14 months, enough time for management to come to some preliminary conclusions as to whether Plaintiff was performing well in his new position.  Again, this document serves to demonstrate that Plaintiff's performance continued to be deficient, even in this new position, and supports Defendant's legitimate business reasons for Plaintiff's termination.  Granting Plaintiff every possible favorable inference, the evidence of record does not support Plaintiff's theories and suppositions of a company-wide scheme, spanning two supervisors, to discharge Plaintiff on the basis of his age or race.  The record is clear that as far back as two years before his discharge, Plaintiff's performance began to deteriorate; Plaintiff's discharge was premised upon more than simply his failure to meet his PIP goals.

Plaintiff also directs this Court to the PIP goals and objectives concerning the various conversion opportunities and again, suggests that Plaintiff was "set up" to fail because these goals were unattainable.  Clearly, the record reflects Defendant's desire to work with the Plaintiff to help him succeed.  Specifically, Davis testified as follows:

Q.   What was the status as of June 13 in terms of any projects that had been closed by Mr. Stiffler?  Were there any projects that had been closed?
A.   No.
Q.   Did you have any discussion with Mr. Stiffler about modifying the number of projects that he'd have to close?

A.     Yes, I did.

Q.     What was done?

A.     Well, I agreed to modify the number of proposals. I don't recall if there [sic] was here, but I recall from six to four and then from four to a lesser number and ultimately to just get one done.

. . .

Q.     What your saying today is instead of this reference to six by May 10 and two thereafter, which you incorporated into your June 13 letter, that was changed to one? . . . Is that what you're saying, that was changed to one?

A.     What I was trying to communicate to Jim was Jim, this shows some sufficient progress, that you're making progress towards closing a deal. I made reference to just get a project closed. Was I inferring if he did one, he would be totally successful against the performance improvement plan? I don't think that was the indication as much as it was you got to show more progress towards closing on a project.
I was trying to encourage him. This isn't some design to cause you to fail. If you show some sufficient progress, then maybe there's something else I can do. I was kind of advocating to him to give me something to work with.

(Davis Dep. at 300-01, 329-30.) In addition, the record is also clear that Plaintiff objected to

some of the goals and deadlines in his PIP and modifications were made to address all of those

objections. (Doc. No. 10 at ¶ 96, Doc. No. 30 at ¶ 96.) Moreover, even in light of Lucas's and

Bearer's testimony that they believed Plaintiff's PIP goals were aggressive or unreasonable, the

parties do not dispute the fact that Plaintiff achieved no conversions that generated revenue for

the Company.

Plaintiff's next argument as to why Defendant's articulated reasons for Plaintiff's

discharge are pretext is that the reasons given by Lucas for Plaintiff's discharge are inconsistent

with Defendant's stated reasons. The Court has conducted a thorough review of this record and

can find no such contradiction. Lucas came on as Plaintiff's new manager on May 20, 2002,

approximately two and one-half months after Plaintiff's PIP commenced on March 1, 2002.

Lucas did testify that in his opinion, one aspect of Plaintiff's PIP goals concerning equipment

conversions may have been overly aggressive, but as noted above in Davis's quoted deposition

testimony, the Company attempted to work with Plaintiff and encouraged him to complete even

just one conversion.  The record does not reflect, however, that Lucas's stated reasons for

discharge contradicted those given by Defendant.  Lucas, Plaintiff's manager at the time of his

termination, testified that the decision to finally discharge Plaintiff was a joint decision made by

himself and Davis.  There is absolutely no support in the record for Plaintiff's assertion that it

was made solely by Davis other that Plaintiff's observation that at the termination meeting,

"Davis did all the talking and basically Lucas hardly said anything."  (Doc. No. 29 at p. 19.)  As

Plaintiff's new manager beginning on May 20, 2002, Lucas set his own goals for his new

department and assessed Plaintiff thereunder.  Moreover, on Lucas's first day as Plaintiff's

supervisor, he immediately learned from Plaintiff of his dislike for his former supervisor,

Graham, and his dislike for the Company in general, both of which were two of the many

articulated reasons for Plaintiff's discharge.

      Plaintiff also offers as evidence of pretext the fact that Plaintiff was terminated

after 20 years with the company without prior complaints or warning from the company.  The

law in this Circuit is clear that pretext is not established by virtue of the fact that an employee has

received positive reviews in the past.  See Ezold, 983 F.2d at 528.

      This Court has conducted a thorough and painstaking review of the record and

recognizes the difficult situation in which the Plaintiff finds himself after his termination.  It is

not a violation of the ADEA, however, for an employer to take steps to rehabilitate an ailing

29

company, even if the rehabilitation requires the implementation of a voluntary resignation program, and a new performance evaluation plan that results in the termination of many employees in an indisputably older workforce.  What the ADEA does prohibit is the selection of those employees for termination on the basis of their age.  Here, Plaintiff has failed to put forward "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Defendant's] proffered legitimate reasons for its action that a reasonable factfinder <u>could</u> rationally find them unworthy of credence."  <u>See</u> <u>Fuentes</u>, 32 F.3d at 765 (internal quotation and citation omitted) (emphasis in original).  Therefore, it is recommended that Defendant's Motion for Summary Judgment relating to Plaintiff's claim for age discrimination in employment pursuant to the ADEA be granted.

<u>Reverse Race Discrimination pursuant to Title VII</u>

Plaintiff's responsive brief to Defendant's Memorandum in Support of Motion for Summary Judgment does not address his reverse race discrimination claim although he indicates that a discussion will follow at footnote 5 of his responsive brief.  Yet, no discussion is forthcoming.  Otherwise, Plaintiff dedicates only one paragraph out of 207 in his Amended Counter Statement of Facts to this claim.  Specifically, at Paragraph 157 Plaintiff states that Harris, who is black, received more "L" ratings for his performance than Plaintiff and yet he received an overall "S" rating while Plaintiff received an overall "L" rating.  Yet the record is clear that value drivers were weighted differently, and Plaintiff received his "L' ratings for those drivers related to his Energy Technology Coordinator position.  Clearly, without more, such discrepancy can hardly be viewed as evidence of pretext, and Defendant is entitled to judgment as a matter of law on Plaintiff's Title VII reverse discrimination claim.

Therefore, it is recommended that Defendant's Motion for Summary Judgment relating to Plaintiff's reverse race discrimination claim pursuant to Title VII be granted.

2.    <u>Commission Claim pursuant to Wage Payment Collection Law</u>

Plaintiff also claims that certain commissions were not paid to him in violation of the Wage Payment Collection Law ("WPCL").  The WPCL creates a statutory remedy for an employer's failure to pay earned wages.  <u>Weldon v. Kraft, Inc.</u>, 896 F.2d 793, 801 (3d Cir. 1990). The contract between the employer and its employee governs in determining whether specific compensation is earned.  <u>Id</u>.

Plaintiff admits that his claim is for commissions that he alleges he earned between January 1, 2001 and October 12, 2001.  (Doc. No. 10 at ¶ 177, Doc. No. 30 at ¶ 177.) Yet, the record is clear that there was no commission plan in effect at that time.  Plaintiff admits in deposition testimony that he was told by Dave Smith, Equitable's Director of Compensation and Benefits, that there was no commission plan in effect for the 2001 calendar year as follows:

> Q.    When Mr. Smith met – well, did Mr. Smith meet with you individually or meet with the whole group?
> A.    He met with the whole group.
> Q.    And when he met with you as a whole group, isn't it true that what he said was there was no bonus plan in effect for the year 2001?
> A.    That was his contention.
> Q.    That's what he said, correct?
> A.    I can't recollect his exact words.
> Q.    But would you agree with me that he conveyed to the group that it was his view, position, contention, whatever word you want to use, that there was no commission plan in effect for calendar year 2001?
> A.    I can't remember his exact words, but they gave us a letter, and I think that would memorialize what was discussed at the meeting.

(Stiffler Dep. at 245.)  Consequently, Jeffrey Nehr, an employee of Defendant responsible for the

calculations for the commission program, testified specifically as to who fell under the

commission program, who directed when commissions would be paid, and when in fact,

commissions were not payable:

> Q.    Do you have any familiarity with a commission program?
> A.    Yes.  I used to be the person who would work up the calculations that
>       would ultimately end up achieving their getting paid.  I was, more or less,
>       an administrator.  There was people that set policy.  I just administered.
> Q.    When you refer to the individuals who would be getting paid based upon
>       whatever calculations, which individuals were those?
> A.    They were all the folks that reported to Steve Graham that were in the
>       direct sales force.  So that would be Averell Harris, Jim Stiffler, Joe
>       Becker, and then there's a period where there was Donna Sassick as well.
>
> . . .
>
> A.    Sure, but for the most part when we were doing calculations, it was for
>       business that was originated in 2000.  We didn't do any commission for
>       business that was generated in 2001, not to my knowledge.  So like if you
>       have a deal and it's a three-year deal and it started in 2000, they would
>       have commission checks that could go 2001, 2002, et cetera.
> Q.    So what's the difference about the year 2001?  Are you saying you didn't
>       do any calculations?
> A.    For deals that were originated in 2001.
> Q.    For deals that were originated in 2001?
> A.    That's correct.
> Q.    Why did that change occur?
>                          [objection to foundation]
> Q.    If you know.
> A.    I was directed to do so.
> Q.    By whom?
> A.    By Steve Graham and management.
> Q.    When you day "management," to whom are you referrring?
> A.    Steve Graham who was at the time my direct supervisor.  This is how I
>       want you to do it.

(Nehr Dep. at 9, 15.)  Plaintiff can offer no evidence other than his own misunderstanding that

Defendant had a commission plan in effect for 2001.  Hence, it is recommended that Defendant's

Motion for Summary Judgment on Plaintiff's claim for unpaid commissions pursuant to the

Pennsylvania Wage Payment Collection Law be granted.


III.     <u>CONCLUSION</u>

_____It is respectfully recommended that the Motion for Summary Judgment filed by

Defendant Equitable Resources, Inc. at Docket No. 9 be granted.

          In accordance with the Magistrate's Act, 28 U.S.C. § 636(b)(1)(B) and (C), and

Rule 72.1.4(B) of the Local Rules for Magistrates, the parties are allowed ten (10) days from the

date of service to file objections to this Report and Recommendation.  Any party opposing the

objections shall have seven (7) days from the date of service of objections to respond thereto.

Failure to file timely objections may constitute a waiver of any appellate rights.




                              s/ Lisa Pupo Lenihan
                              LISA PUPO LENIHAN
                              United States Magistrate Judge


Dated: August 23, 2006


cc: The Honorable Terrence F. McVerry
    United States District Court Judge

    Edward A. Olds
    1007 Mount Royal Boulevard
    Pittsburgh, PA 15223
    Email: edolds@earthlink.net

Michael J. Lorence
1007 Mount Royal Boulevard
Pittsburgh, PA 15223
Email: lorence@lcsys.net

Joseph P. McHugh
Reed Smith
435 Sixth Avenue
Pittsburgh, PA 15219-1886
Email: jmchugh@reedsmith.com

Martha Hartle Munsch
Reed Smith
435 Sixth Avenue
Pittsburgh, PA 15219-1886
Email: mmunsch@reedsmith.com